[Cite as *In re T.T.*, 2014-Ohio-5447.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

IN THE MATTER OF: T.T., E.H. and Q.B.    :

                               :         C.A. CASE NO.    2014 CA 48

                               :         T.C. NO.   2012-575, 2012-576
                                               2012-577

                               :

                               :      (Civil appeal from Common
                               Pleas Court, Juvenile Division)

                               :

                               :

. . . . . . . . . .

## O P I N I O N

Rendered on the ____12th____ day of ____December____, 2014.

. . . . . . . . . .

KATE BOWLING, Atty. Reg. No. 0084442, 111 W. First Street, Suite 518, Dayton, Ohio 45402
      Attorney for Appellant

LESLIE S. BUCHANAN, Atty. Reg. No. 0023151, Assistant Prosecuting Attorney, 1345 Lagonda Avenue, Springfield, Ohio 45503
      Attorney for Appellee

. . . . . . . . . .

FROELICH, P.J.

{¶ 1}    Mother appeals from a judgment of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, which granted permanent custody of three of her sons, T.T., Q.B. and E.H., to Clark County Department of Job and Family Services ("CCDJFS")

{¶ 2}    The children were removed from Mother's home in April 2012, after employees of T.T.'s school became aware of extensive bruising on his body, and he reported that his mother had hit him with a belt.  (Mother was convicted of domestic violence in August 2012, related to this incident.)  The children were placed in the custody of a relative for about six months; when the relative decided that she could no longer care for them, the children were placed in two different foster homes under the temporacry custody of CCDJFS. T.T. and Q.B. were placed together in one foster home, and E.H. was placed in another foster home, where his significant medical needs could be addressed.

{¶ 3}    At the time of the final hearing and judgment in this case, T.T. was 15 years old, Q.B. was 11, and E.H. was 7.  The three older children are boys.  The fourth and youngest child, a daughter, age 3, had also been removed from Mother's home, but was not a party to this case; it appears that placement with her father was considered to be a possibility. The three boys have different fathers, none of whom is a presence in the family or provides support; T.T.'s father is deceased.

{¶ 4}    The requirements of Mother's case plan included having mental, psychological, and psychiatric assessments and following through with any recommendations resulting from those assessments, visiting with the children, completing a parenting class and

increasing parenting knowledge, and family therapy with the children to help address the family's "turbulent history." The plan specified that the family therapy would occur if and when the children's therapist felt it would be beneficial to the children. Mother had a long histroy of involvement with children services agencies, including mental health issues, abuse, and neglect.

**{¶ 5}** In October 2013, CCDJFS filed a complaint for permanent custody of the three boys. A hearing was held over four days in February 2014. On March 14, 2014, the trial court granted CSSS's request for permanent custody of the three boys.

**{¶ 6}** Mother appeals, raising one assignment of error, which states:

**The trial court erred in granting permanent custody to Clark County Children Services because that agency failed to prove by clear and convincing evidence that permanent custody was in the best interest of the minor children and reunification was not possible.**

**{¶ 7}** Mother contends that she complied with all the elements of her case plan, except for family counseling, and that the failure to start such counseling was caused by CCDJFS "mismanagement." She asserts that granting permanent custody in this case "cut off a real possibility of reunification," and that the trial court's judgment should be reversed.

**{¶ 8}** R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with

either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. R.C. 2151.414(B)(1); *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.,* 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8.

{¶ 9}  R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.  R.C. 2151.414(D); *In re S.J.* at ¶ 15.  R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

**{¶ 10}** A trial court's decision on termination "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re A.U.,* 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J.Y.,* 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 33.

**{¶ 11}** The State's witnesses at the hearing on permanent custody included two caseworkers from CCDJFS, a forensic chemist, two counselors for mental health and chemical dependency, a psychologist, a visitation supervisor, the children's foster mothers, and the guardian ad litem.

**{¶ 12}** The caseworkers testified that Mother had been involved with children services agencies in Clark and Montgomery counties since 1998 and that mental health counseling had been a component of all her case plans. Mother was a minor and in foster care herself when her first child, T.T., was born. T.T. was born with a heart condition and was raised primarily by his maternal grandmother for several years. In 2002, Q.B. was born and tested positive for marijuana, which led to referral to children services. E.H. was born in

2007. There were numerous other incidents of physical abuse and neglect between 2002 and 2010. In 2009, E.H. suffered serious injuries when he was hit by a car, which led to physical and mental disabilities and the need for intensive rehabilitation. Mother was also in more than one abusive relationship herself during this period, and she spent time in a nursing home in 2010 recuperating from serious injuries. There had been several case plans between 1998 and 2012 involving Montgomery and Clark County children services agencies.

{¶ 13} In the current case, Mother was referred to CCDJFS in 2012 when T.T., who was badly bruised, reported to school officials that his mother had hit him with a belt. When officials went to Mother's house, she was loud, argumentative, and uncooperative. She initially refused to provide the names of any relatives who might be able to care temporarily for the children. The children were eventually placed with a relative, G.A. Approximately six months later, G.A. asked that the children be removed from her care, and they were placed in foster care. E.H. was placed in a foster home for "medically fragile" children, where the foster parents had specialized training and experience to deal with his medical needs. T.T. and Q.B. were placed together in a different foster home.

{¶ 14} At the time of the children's removal from Mother's home in April 2012, E.H. was 5 years old, Q.B. was 9, and T.T. was 13. The children exhibited a number of physical, emotional, and mental health challenges at that time, which will be discussed in greater detail below.

{¶ 15} Dr. Daniel Hrinko, a psychologist who evaluated Mother in May 2012, testified that her history "includes relatively high levels of trauma and emotional instability," a chaotic childhood, and an alcoholic father who was absent and/or abusive. As a child,

Mother was put in a position of caretaker for her own mother, who had many medical issues and who died when Mother was 11 years old. Mother had very few relatives and ended up in foster care. She "had very few opportunities to witness a healthy relationship, to experience reasonable and appropriate parenting skills and that sort of thing, which is an important source of information about how we tend to raise our children."

{¶ 16} According to Dr. Hrinko, Mother had a long history of "brief, unstable, generally negative relationships" with men who were abusive and/or abused drugs; her relationships contributed to the unstable living situation for her and her children. Hrinko testified that Mother had "no significant involvement with mental health treatment," notwithstanding case plans going back many years which included such treatment as a component. Mother had four children fathered by four different men, none of whom was involved with the children "in a positive way."

{¶ 17} According to Dr. Hrinko, Mother's work history was limited to being a dancer at clubs. In recent years, she had suffered serious injuries from an assault and had surgery on her hand related to incidents of domestic violence; she had recently applied for Social Security Disability. Mother also had an extensive history with the juvenile court system herself; as a teenager, she had attempted to kill her grandfather, had run away, and had committed other crimes.

{¶ 18} Mother acknowledged problems with communication and a "history of impulsive behaviors and mood swings." According to Dr. Hrinko, Mother had past suicide attempts, had exercised poor judgment and impulse control, and kept finding her way into negative situations, even though she recognized them as such. Hrinko testified that, in their

interviews, Mother exhibited "consistent patterns of her either minimizing, blaming other people, or avoiding her responsibility for these negative situations that developed, painting herself either as the victim of someone else's bad judgment, someone else's decision, someone else's desire to control, but at no time did she indicate that she was able to recognize that she had made choices that contributed to bad situations that needed to change."

{¶ 19}    Dr. Hrinko's recommendations for Mother included parenting classes to improve her parenting skills and to teach methods of discipline other than those which had brought her to CCDJFS's attention, individual therapy focused on her own role in contributing to the family's problems and the need for positive relationships, and seeing a psychiatrist for medications for her mood disorder and depression.    Hrinko observed that, at the time of his evaluation, Mother "had significant problems that would interfere with her ability to function as a safe and effective parent"; she became "overwhelmed by her moods and act[ed] in a less than mature way."    He also testified that Mother had spoken to him in a manner that "caused [him] to believe that [she saw] the solution of the problem between her and her older son [T.T.] was exclusively with [T.T.] learning how to behave himself," and that she was "unable to see how she was failing to exercise reasonable judgment and appropriate parenting techniques to participate in this process of helping him become a better kid."    Mother also minimized the severity of her abuse of T.T., stating that she had "only hit him four times with a belt."    However, Hrinko believed that if Mother embraced the opportunities for help available to her and followed his recommendations, "there was a probability that she would be able to make the changes necessary to allow her to then again function as a safe and appropriate parent."

{¶ 20} Mother underwent a drug and alcohol assessment at McKinley Hall with Sarah Collinsworth in October 2013, after which she began therapy; the assessment was done approximately 18 months after the children were removed from Mother's care. Collinsworth testified that Mother was diagnosed with "cannabis disorder," nicotine dependence, and depressive disorder; the therapist recommended individual therapy and group sessions multiple times per week. Collinsworth testified that Mother behaved somewhat disruptively and inappropriately during group sessions. For example, Mother would comment on whether other participants were taking their treatment seriously, she read books aloud, left to smoke cigarettes, did not follow directions, and behaved as if she were the therapist for other participants. Because of her disruptive behavior, her involvement in these sessions was terminated until such time as her medications made her behavior more appropriate. Collinsworth testified that Mother expressed more anger than remorsefulness about her children during therapy sessions and that she resisted medication and additional services. Mother tested positive for opiate pain medication and marijuana a couple of weeks after her assessment with Collinsworth. (The positive test for opiates was apparently related to a recent surgery on her hand, which was necessitated by physical abuse.) Collinsworth reported that, when Mother took her medication, her mood and conversation skills improved. Although Mother recognized that the medications made her "feel better," she continued to question whether she needed them.

{¶ 21} The current caseworker, Nikki Berry, and the foster mothers testified about the circumstances and needs specific to each child.

{¶ 22} T.T. had the most difficult relationship with Mother, because he perceived

that she blamed him for the children's removal from the home and for an incident in which E.H. was struck by a car in the street in front of the family's home in 2009. The therapists involved in the case concluded that these beliefs on T.T.'s part were not unfounded, although Mother denied that she placed such blame on T.T.

{¶ 23} Mother initially visited with T.T. two times per week, but by the end of 2012, she was expressing doubt or unwillingness about continuing these visits; she wanted to exclude T.T. from her visits with the other children. Because the caseworker and therapist believed that there would be adverse effects on T.T. if he were excluded from the visits, all visitation was suspended for a few months. When the visitation resumed in April 2012, the foster mothers and visitation supervisors noticed that T.T.'s and Q.B.'s behaviors worsened during and around the time of the visits with Mother. The older boys also experienced hurt feelings when Mother would bring gifts for the younger children at visits but not for them.

{¶ 24} T.T. was very small, frail, and withdrawn when he was placed in the foster home, but he had since gained weight. T.T.'s emotions and behaviors had also become more "steady," he was developing well, and he was more logical and calm. During periods when he was not visiting with his Mother, T.T. became a "role model" in the home (which included numerous other children), and the foster mother believed that she could depend on him "to do the right thing." At the hearing, T.T.'s foster mother testified that his mood swings were almost gone, he was getting good grades, and he had joined the wrestling team at his school. T.T. did need occasional discipline, such as grounding, loss of computer time, or extra chores, but he responded well to these methods.

{¶ 25} Q.B. was also very reserved and thin when he was placed in foster care,

and he would also be "hyper," aggressive with the younger children in the home, defiant, and disrespectful of authorities such as the foster parents and teachers. The foster mother reported that Q.B. had a "sense of entitlement," that he would steal things, and that there were a couple of incidents where he caused physical harm to younger kids but would not take responsibility for it, claiming that he had been picked on. Q.B. had become more outspoken over time, was developing well, and was taking medication to improve his behavior; Q.B. continued to have occasional outbursts. According to their foster mother, Q.B. and T.T. did not interact much in the home, in part because of their different schedules, and often fought when they did see one another.

{¶ 26} E.H. had significant developmental and medical challenges, which the caseworker and his foster mother traced to his having suffered a traumatic brain injury when he was hit by a car in 2009. When he came to foster care, E.H. was "stiff and rigid," "completely non-verbal," and had leg braces that did not fit. His speech was very difficult to understand, he "seemingly had no concept of communication at all," cried, screamed, and had significant tantrums. Prior to his removal from Mother's home, the only therapies or interventions he had received were those available at school. During foster care, E.H. received intensive therapy at Nationwide Children's Hospital in Columbus, including occupational, physical, and speech therapies; he was also in special education classes at school. E.H. had gradually learned to communicate through head shakes and some sign language, and had learned about 18 words by the time of the hearing. E.H.'s ability to use sign language was limited or modified due to his ability to use only one of his hands. The foster mother suspected that E.H. was suffering from seizures, and he was in the process of

undergoing neurological testing at the time of the hearing. E.H. also needed a lot of dental care, for which he needed to be sedated because of his other impairments, and he had, for a time, received therapeutic Botox injections to assist with his use of his legs. E.H.'s foster mother testified that E.H. uses a lot of energy trying to move, which can cause dehydration, but he cannot easily or safely get a drink of water on his own due to his physical limitations. E.H.'s foster family was interested in adopting him.

{¶ 27} Berry also testified about the development of the case plan objectives and her work with Mother to fulfill those objectives. Mother did not get the psychiatric evaluation required by the case plan for approximately 10 months after the plan's implementation; this evaluation was intended to address her depressed mood and impulsive behaviors. The stabilization of Mother's moods and behavior was viewed by the caseworker and the children's therapists as a prerequisite to family therapy. When Mother eventually did see Dr. Yakhmi, she was prescribed Zoloft and Risperdal, which led to more constructive team meetings and progress on her case plan. Once Mother's behavior stabilized, her visitation with the children resumed.

{¶ 28} After the first few visits, however, the older boys' behaviors deteriorated, especially Q.B., who would have tantrums and outbursts. T.T. and Q.B. were resistant to Mother's attempts to discipline them during visitation, and Mother soon concluded that T.T. and Q.B. were "too much for her to handle." She was "emotionally overwhelmed" by the older boys and wanted another break from visiting with them. Berry encouraged Mother to talk with her counselor about these feelings.

{¶ 29} Concerns also started to arise again about Mother's mental health, stability, and compliance with taking her medications. In the summer of 2013, a drug screen

confirmed that Mother was not taking all of her medication as prescribed. One of the drugs, Zoloft, was found in her system at appropriate levels; another prescribed drug, Risperdal, was not found in her system, which was interpreted by a forensic chemist to mean that she had not taken the drug in the 24 hours prior to the test. Mother also tested positive for marijuana usage at the "higher end of what we [the clinicians] normally see."

{¶ 30} With respect to housing and Mother's ability to support herself, Berry testified that Mother had no income or public assistance, although she had applied for Social Security. Mother relied on her married boyfriend, with whom she lived. Mother had been terminated from Section 8 housing when she was convicted of felony domestic violence against T.T.

{¶ 31} Berry testified that, when she would attempt to discuss with Mother her limited progress on the case plan, Mother claimed she was doing everything on the case plan. Mother also asserted that there were relatives willing to take the children, but she never provided the names of such relatives to CCDJFS, nor were the relatives in contact with the agency. Berry stated that CCDJFS had provided all of the services it could offer to Mother to assist with reunification, but that she (Berry) did not believe the children could be safely reunified with Mother. Berry had continuing concerns about Mother's mental health and stability, and noted that, over an extended period of time, Mother's periods of stability had lasted only for short time periods. Berry observed that the children were capable of bonding and had bonded with their foster families, and that the children had shown substantial progress in the stable environments of their foster homes.

{¶ 32} The guardian ad litem, Michael Edwards, testified that E.H. was very

happy, comfortable, and engaged in his foster home and was getting good care for his needs. He also stated that T.T. and Q.B. were behaving very appropriately in their foster home. According to Edwards, T.T. preferred to stay in the foster home than to be reunified with his Mother due to past abuse and negative feelings; the guardian ad litem had "no doubt that [T.T.] has the intellectual capabilities and the maturity to make that decision." Q.B., on the other hand, was "on the fence" about his placement; he was more concerned with being with his siblings than with his mother, and was reluctant to give an answer about his placement. Although Edwards recognized that "a fairly strong bond as a family" existed, he recommended at the hearing that permanent custody be given to CCDJFS; he cited Mother's longstanding and/or recurrent belief that she does not need medication, her past mental health issues, and the past severe abuse of T.T.

{¶ 33} Edwards acknowledged that, in an earlier report to the court, he had recommended an extension of temporary custody due to concern that family counseling had not yet occurred. After obtaining additional information about the case and Mother's history, he changed his recommendation at the hearing and supported the award of permanent custody to CCDJFS. On cross-examination, Edwards acknowledged that he had relied on the reports of Dr. Yakhmi and care providers at McKinley Hall, rather than talking with them personally. He also acknowledged that he had not talked with Mother's boyfriend, but he described the boyfriend as "evasive" and "uncooperative," which caused Edwards concern.

{¶ 34} Mother called several witnesses at the hearing, including the coordinator of her parenting class, a visitation supervisor at Gibault, her boyfriend, her probation officer, and her therapist at Well Springs; she also testified on her own behalf.

**{¶ 35}** The parenting class coordinator testified that Mother had completed that class and had seemed to be engaged in the program. The probation officer reported that Mother checked in with him consistently.

**{¶ 36}** The visitation supervisor, who observed visits with all four children between May 2013 and July 2013, and with only the two younger children from July 2013 until the time of the hearing, testified about some of the emotional difficulties that occurred during visits with the older children. She stated, however, that Mother's discipline was "proper" and that she did not behave erratically. She testified that Mother visits with E.H. very consistently and that E.H. "lights up like a Christmas tree" when he sees Mother.

**{¶ 37}** Mother's boyfriend testified that he had been living with Mother for two years "this most recent time." He was still married to another woman, but he was trying to locate his wife in order to get a divorce, and planned to marry Mother. He stated that Mother takes her medication twice a day and that she does not intend to use corporal punishment in the future. He also testified that Mother does not blame T.T. for E.H.'s accident or for the boys' removal from her home. The boyfriend acknowledged that he was present when T.T. got a "whippin'" with a belt from Mother and that he had not complied with a request that he be fingerprinted for the case plan.

**{¶ 38}** A therapist from WellSprings testified that Mother vacillates between taking responsibility for T.T.'s abuse and blaming T.T., but said that Mother accepted responsibility for E.H.'s accident and did not blame T.T. for that incident. He also testified that Mother wanted family counseling and did not understand why it was not happening; the therapist recognized, however, that family counseling could be detrimental to the children if

they were not ready for it.

{¶ 39}   Mother testified that she felt she had done everything the case plan required, and that several of the objectives, as she understood them, had been satisfied, including learning alternate forms of discipline to corporal punishment.   She testified that she had been "whooped with belts, extension cords, and switches" as a child.   As for why she had "whipped" her children, she stated that she had hit T.T. and Q.B. with a belt in the past when they had played on the roof of a church, and that she had whipped T.T. another time for getting more than 30 detentions and being disruptive at school.   She admitted to past marijuana use, starting at a young age, which had intensified when her children were first taken from her in this case, due to stress and anger.   She expressed her view that one-on-one counseling with T.T. and the attendance of the children at some of her parenting classes would have helped them, but these things had not been allowed.   She also stated that her new medication (Depakote) was working better than the previous combination of Zoloft and Risperdal to stabilize her moods.

{¶ 40}   Mother testified that injuries to her hand prevented her from working, that she was applying for disability, and that, in the meantime, her boyfriend supported her financially and was willing to support her children.   With respect to her history of abusive relationships, Mother testified that most of the past abuse had occurred outside the home, while she was at work as a stripper, dancer, or entertainer, or when her children had not been living with her, suggesting that the children's exposure to the abuse had been limited. She asked that temporary custody be continued or that the children be placed with relatives and friends; she acknowledged that, although these relatives and friends had expressed to her their

willingness to help, they had not communicated that willingness to CCDJFS.

{¶ 41}     In September 2013, Mother's chemical screen tested positive for Zoloft, but not for Risperdal; both drugs had been prescribed for her mood disorder and depression. She also tested positive for marijuana at that time.   In December 2013, Mother tested negative for marijuana, but she was not screened for the presence of the prescribed medications.

{¶ 42}     The trial court found that the children continued to be dependent, that Mother  had failed to substantially complete the case plan, that she had provided no meaningful support for the children, and that CCDJFS had made reasonable efforts toward reunification.  The court further concluded that the children could not be placed with either parent within a reasonable period of time; "[t]he parents have offered no evidence to indicate they are ready, willing, or able to provide for the needs of the children.  It would be inappropriate and unsafe to place the children in the home of the parents."  In regard to the ability to reunify the family in a reasonable period of time, the court specifically found that Mother's conviction for an offense against one of the children and her "chronic mental illness" which, when untreated, makes her unable to provide an adequate home for the children, precluded reunification within a reasonable time.

{¶ 43}     With respect to the children's best interest, the court found that it was in the children's best interest to grant permanent custody to CCDJFS.  The court concluded that the children would benefit from permanent, secure homes, the older children had not had meaningful contact with Mother for several months, the conditions that led to the removal of the children had not been substantially remedied, there were no relatives with a genuine interest in the children (notwithstanding Mother's claims to the contrary), the custodial history

indicates that the children's needs cannot be met by Mother, the guardian ad litem recommended permanent custody for the three boys, and there was "no safe, appropriate, harmonious and loving relationship" between the children and their parents or other relatives.

{¶ 44}     Having thoroughly reviewed the record of this case and the evidence presented at the hearing, we cannot conclude that the trial court abused its discretion in awarding permanent custody to CCDJFS.   There was clear and convincing evidence to support the conclusion that such an award was in the best interest of the children and that the children could not safely be reunified with Mother within a reasonable period of time.

{¶ 45}     The assignment of error is overruled.

{¶ 46}     The judgment of the trial court will be affirmed.

. . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Kate Bowling
Leslie S. Buchanan
Hon. Joseph N. Monnin